This is our first day of our September term of court. Bear with me as we get the acoustics correctly done. With me is Judge Baldock and Judge Holmes, Judge Temkevich. We have 15 minutes per side. There's no case following, so there might be a little bit of flexibility in there. But let's go ahead and get started with the appellant, Mr. Dunn. Good afternoon, Your Honors. My name is David Dunn, and may it please the court, with co-counsel Ronald Silverman. I represent Drivetrain LLC, which is the trustee of the Missouri bankruptcy cases. The parties here are a little bit confusing because we have the Missouri trustee and the Kansas trustee. To simplify it, I'll refer to my client as Drivetrain if that's OK. I'll refer to the Missouri trustee as Mr. Kozel. So that we can separate them, and it's easier to say. And I'll call the debtor here ABBK, because I only have 15 minutes. And if I have to say, Abengoa Biomass Bioenergy of Kansas every time, I think I'll use up all my time. I should disclose out front that I was in Dodge City a couple of weeks ago, and I randomly drove through Hugaton. But it was not a site visit. I didn't see the plant, but I very much enjoyed Hugaton. Very good. I can't say I've had that pleasure, Judge Temkevich. These are two related appeals that arise from the bankruptcy case of ABBK. ABBK was one of a group of energy subsidiaries, bioenergy subsidiaries, of Abengoa Energy Company, which is a Spanish energy construction company that ran into financial difficulties in 2014 and 2015. Abengoa had a series of bioenergy subsidiaries in the United States, all of which were headquartered and operated out of common offices in Chesterfield, Missouri. One of those entities operated a plant, or was building a plant, and operated a plant in Hugaton. And that led to the involuntary filing of this bankruptcy case in Kansas, whereas all of the other bioenergy subsidiaries were in Missouri. Those cases were resolved. There was a confirmed plan, and our client is the trustee of the Missouri Bankruptcy Trust, pursuant to the plan. You know, one foundational question I had is, we have two appeals here, one from the stay order, one from the equitable mootness order. There's been no stay here. I assume that there's been substantial distribution of the assets of the estate. But as to the appeal, or the stay appeal, why isn't that moot? Because we're in a posture today to resolve the equitable mootness appeal. If you win, we would probably remand it. You know, the case would be where it is. I just don't see what we benefit from entertaining the stay appeal at this point, and whether there's really a live controversy. What's your comment on that? Well, there is, as of the last report by Mr. Cozell, $1.7 million remaining in assets of the trust. We've been deprived of the opportunity to go after the other assets to date, although our position, as you may be aware, is that disgorgement would be appropriate if there were a reversal of the confirmation order. But you only get to risk disgorgement if we rule in your favor on the equitable mootness appeal, right? Right, but I'm still entitled, at least, to leave that $1.7 million, which is about 8% or 10% of the assets. And if the state- How does that bear on the stay appeal? Because it keeps the controversy live, because otherwise the trustee may distribute those funds. If you enter a stay order, he would be barred from distributing those funds that remain in the estate. So as long as there's something left, and that something left, by the way, also I think bears on the equitable mootness argument, because there is still $1.7 million. There was $3 million left at the time the district judge dismissed the case as equitably moot. And even if we can't make a full recovery, the fact that those assets are available and should be preserved pursuant to the stay appeal, I think, is relevant. In addition, the stay is really relevant, and I think you're going to have to effectively decide the stay issue anyway under the equitable mootness argument, because the first criteria with respect to equitable mootness is the diligence of the appellant in seeking a stay. Now, we think- Wait, wait, wait, wait, wait, wait. I know where you're going with that argument. And the diligence, you're arguing that the diligence you're disclosing was at the district court level. And at this level. And I can't find anywhere in the record that you asked for a stay up here at any time. No, we made an appeal, and we asked for a stay And you didn't ask for any kind of emergency proceedings or anything like that, did you? When the stay was denied in the district court, we moved for a stay in this court as well, and we appealed the district court's denial. That doesn't get you a stay just because you appealed. You've got to have something from us that says stay it. And that would prevent the trustee from distributing any assets, right? But the district court had denied a stay pending appeal, and we made a- So what? You didn't get, you went ahead and appealed. It's kind of like appealing a damage judgment without posting a bond. You can do it, but that doesn't keep the other person from exercising their right to collect their money. I understand. Here, you didn't ask for a stay up here. You just appealed it. So my question is, how does that prevent the trustee from distributing the money until a stay is granted? It does not. There was no stay. I don't think there's any question that the trustee had authority to distribute the money in the absence of a stay, but I don't know what more we could have done other than to immediately appeal, and we made a motion to expedite the appeal, and we made a motion to expedite. That goes back to your question that you were going to say that as to the very first point of the equitable mootness issue is how diligent were you in seeking a stay? Yes, and- In the district court. And we moved to expedite. We appealed to this court and moved to expedite the appeal in this court as well. And just to be clear, didn't you seek an emergency stay here? Yes, we did. As well. Yes, we sought a stay in this court as well. Okay. That's my understanding, yes. So we've sought a stay at every single level. I think we have been diligent, but the point I was going to make is if you find a stay should have been granted, that would affect the equitable mootness argument, and I think the issues, as Judge Timkovich said, are really intertwined between the stay and the equitable mootness argument, because at least two of the factors in equitable mootness, whether we should have been granted a stay, which I think is clearly relevant, and the, if you will, the informal look at the merits, are bound up with each other. Yes, the first equitable mootness really goes towards your diligence in pursuing a stay. It's not the question of whether you actually, well, in some sense, it's not the question of whether you won, right? I mean, yes, that's a factor. If you got a stay, that's helpful in terms of the determination of equitable mootness, but part of it's just a diligence analysis, isn't it? In part, but I think if we got a stay, and our adversary says diligence is not enough, certainly if you found the district court was wrongful in denying a stay, that would certainly go to wait on the equitable mootness point, and it would make, clearly mean that the first equitable mootness factor was in our favor. If, but in, okay, I understood that, but in terms of the decisional tree here, if we were to find that the district court did not err on equitable mootness front, the, your appeal of the stay order really in itself is moot, is it not? No, because there's still 1.7, we're a long way from finality in this case. Oh, well, why would that be the case? If you've appealed a determination of the dismissal of the action based on equitable mootness grounds, that's what the district court did, right? Yes, sir. Okay, well, on appeal, if we were to say the district court did not err in dismissing the action on equitable mootness grounds, then there is nothing left, right? I do agree that if you affirm on equitable mootness, the stay appeal is moot, the higher appeal is moot. That's the whole point, is that what the district court said is that the appeal to the district court is moot, but we still have a live appeal on the equitable mootness argument. I agree, since you're gonna decide them both together, if you decide the equitable mootness argument against us, there's nothing left of the stay because there's nothing to stay. We will be out of court. I totally agree with that. And if that's what you were suggesting, Judge Timkovich, I do agree with that. But of course, my position is that we are entitled to a dismissal of the equitable mootness point. And if so, then you have to go to the stay, we're entitled to a decision on the stay appeal because, unfortunately, the merits of the appeal have never been heard. We have a lot of circuit precedent endorsing equitable mootness. How do we get around Page at all? Well, I don't think you have any precedent endorsing equitable mootness in a case like this, Your Honor. There is no case that this court has decided, at least no published opinion, and only one unpublished opinion, applying equitable mootness to a liquidating Chapter 11 proceeding. And there are cases that, in numerous circuits, that have held it doesn't apply to a liquidating Chapter 7 proceeding. And for all intents and purposes- What's the best authority that it doesn't, that equitable mootness does not apply to a liquidating? I'm sorry, does not apply to- What's the best authority? I can't remember offhand, but I think we've cited all those cases in our brief. And I think there's a Third Circuit opinion in Tribune that deals with that. So I think there is clear authority, and numerous courts have said that it doesn't apply. What's the logic of the distinction between a reorganization and a liquidation? I think it's very clear. First of all, we're talking about equity. And I think the whole point is to protect, there are two points here to equitable mootness. One is to protect against, to protect the interests of third parties who deal with a reorganized debtor, who buy equity in a reorganized debtor, who loan money to a reorganized debtor, who do business with a reorganized debtor. Those are innocent third parties who were intended to be protected because they act in detrimental reliance on the validity of the confirmation order. The parties here are just creditors who did nothing post-bankruptcy. All they do is collect money, and they collected money on full notice in this case that our client had objected to the confirmation order and that our client had appealed from the grant of the confirmation order and that our client had sought to stay in every court in favor of a confirmation order so that the creditors don't act in detrimental reliance. They aren't the kinds of innocent third parties. And there's no reorganization here. This is the simplest possible liquidation proceeding. There were not even any assets to sell. It was all cash. So all you have to do is distribute money. The case is indistinguishable from a Chapter 7 case. And from an equity standpoint, there are no third parties who are bringing themselves in and doing business with the debtor after it reorganizes whose interests need to be protected. Even if- Once the money goes out the door like it did here, the trustee's gonna have to go back and claw back or seek disgorgement. Is that, I mean, two questions. One is, do you think there should be a categorical rule prohibiting equitable mootness in liquidating circumstances? And then two, in this case, how are we gonna get the money back so it can be reallocated? I think there should be a rule that it doesn't apply in liquidation proceedings because otherwise you have a tension between Chapter 11 and Chapter 7 liquidation proceedings. And in this case, I think we can get the money back because 55% of the money was distributed to three creditors. And I think to the extent there was an argument about whether disgorgement was possible, the Mission Products case in the Supreme Court this term has really resolved that in indicating that the possibility of disgorgement is available and indeed in Mission Products, the court said that that avoided the mootness. That was constitutional mootness. But there they said the availability of disgorgement, even the possibility of disgorgement was enough. And here we only have to disgorge from three creditors to get 55% of the money back. I'm not saying the trustee or anybody is gonna chase 100 creditors. But if we get 55% of the money back, we're talking about six or 7 million for our creditors, Your Honor. You do, if I understood you correct, there are at least 100 creditors though that were distributed money to, right? There were approximately 100 creditors who were distributed money, but more than half the money went to three. I'm at a point where I wanted to reserve for rebuttal, Your Honor. So I don't know if you want me to continue or sit. If, did he answer your question? No, but that's all right. I think I said there were approximately 100 creditors, yes. But three of them got 55% of the money. You may reserve. Thank you. Good afternoon, Your Honor, Your Honors. Mike Van Deel with the Baker and Hostetler Law Firm. Please pull the microphone up a little higher. A little higher, is that better, Your Honor? Oop, that's right. There we go. Is that better? Yes. Thank you, Your Honors. First, I'd like to say, Mike Van Deel from Baker and Hostetler on behalf  I have with me my colleague, Mr. Cozell, my colleague, Ms. Kelly Bergen, and Mr. Adam Fletcher here as well. I'd like to also say thank you to the court for accommodating my request to reschedule oral argument by moving it up for a couple days. We really appreciate the indulgence of the court. I'd like to address a couple specific points that Mr. Dunn made at the outset. And he contends that a stay is necessary in order to keep a live controversy here. That, to me, seems to be directly at odds with the notion that disgorgement is a remedy that can just be done as a matter of course. Because if that was the case, there'd be no reason for a stay with respect to the remaining $1.7 million that remain in this bankruptcy trust. So those two contentions- We have a live controversy over on the equitable mootness appeal, which we have to address. I don't see what anybody gains by a stay at this point. That seems ancient history at this point. Okay, thank you, Your Honor. The other point that I'd like to make is just to clarify that no motion seeking a stay was filed with this court at any time. It is correct that an appeal of the denial of the stay had been taken, but I just wanted to make sure that the record was clear on that point. Well, that was my understanding, but I wasn't sure that after hearing the response that they had, but I couldn't find in the record that. And you're telling me that from your examination, there has been no motion? That is correct, Your Honor. Okay. I'd like to then address Mr. Dunn's statement that we're a long way from finality in this case. I would submit that based on the actions that have been taken and good faith reliance on this confirmed and unstayed plan over the last 16 months or so, that we are really at the finish line in this case. The trustee has made substantial distributions to over 100 creditors in this case. This notion that those folks are not innocent, quote unquote creditors, simply because they took notice of the fact that Drivetrain had objected to the plan confirmation, had taken appeals, sought stays. I would submit that at the time that they received those distributions, here's what the creditors knew. They knew that Drivetrain came into the case in July of 2017, filed their own competing plan of reorganization. It was balloted and it was rejected by the creditors in our case. At that point, our plan, I say our plan, the ABBK plan proceeded to confirmation. It was balloted, the creditors voted overwhelmingly to support it. At that point, Drivetrain objected to that plan, had a several month discovery process that concluded with a two day confirmation trial at which Judge Nugent heard live testimony. Several weeks go by. In the meantime, then Judge Nugent issues his opinion indicating that he's going to confirm the plan. I believe that was on February 8th of 2018. Drivetrain immediately moves for a stay of the yet to be issued confirmation order, which was to be the final order confirming the plan. Briefing ensued and then Judge Nugent conducted a hearing in between the date of his confirmation opinion and when he issued his confirmation order. Ultimately, that culminated in a final confirmation order on March 29th of 2018 and on that same day, Judge Nugent denied their request for stay as well. So, the next day you move for dismissal? No, actually, that's certainly a fair question, Your Honor, and I think our trustee would have been well on the state plan to do so and in a lot of bankruptcy cases, that is exactly what happens. But that's not what happened here. So, the plan went effective the next day on March 30th. At that point, Mr. Kozell could have distributed all the money. He could have settled with people, he could have disregarded his fiduciary functions and his directives under the plan, but that's not what he did. So, Drivetrain filed an emergency motion for a stay with District Judge Melgrin. That was set for an emergency hearing on April 6th of 2018. We knew that. We could have distributed the money then. We could have done a whole bunch of things to moot their appeal. We did not. They were given an opportunity to obtain an emergency stay from Judge Melgrin. The stay was denied and I would commend Your Honor's reading the transcript of that emergency stay hearing in which Judge Melgrin made it clear his understanding, which is correct, that in order for Drivetrain to succeed on the merits of their underlying appeal of the confirmation order, they would have to show that after trial, various specific factual findings made by Judge Nugent after watching live testimony and considering exhibits, considering post-trial briefing and all those other things were clearly erroneous. And on that basis, he denied their emergency motion for a stay. Subsequent to that, several weeks went by and then we carried out a first interim distribution to certain creditors on May 18th of 2018. While the motion for stay pending appeal remained technically pending, the broader motion, but not all of them. There were at least a dozen or so, maybe more, more like 20 creditors with which Mr. Kozel had various negotiations to try to resolve their claims. Once those claims were resolved, it was only at that point that he made additional distributions. Now, an important point here that I wanna make based on the briefing before the court is that Judge Melgrin denied their Drivetrain stay request on, I believe, June 12th of 2018. Mr. Kozel didn't make the next round of distributions until after that. So this simply isn't a case where Mr. Kozel just hurriedly distributed. Well, that really brings me to, there are several things that bother me about the case, but one is that the denial of the stay here and the liquidating posture of the case means that absent a stay, the estate's going to be distributed. And once that happens, they are in a really tough spot because the money's gone, they've not had appellate review. One question is whether we have jurisdiction over the stay motion, but it does seem to me that the denial of the stay is really kind of the death knell of their opportunity to maintain the status quo of the monetary assets.  it's not like a business is gonna be interacting with customers or whatever happens in every organization. Yeah, and if I can comment on that a little bit. While the plan that's at issue in this case was a simple one, a pot plan in colloquial terms, in bankruptcy speak, where it just primarily involved the distribution of some cash that was sitting there, there were a lot of other things that took place that Mr. Kozel had to carry out as directed by the plan. One of those things was withdrawing $850 million worth of litigation claims that had been asserted in drive trains pending cases in the Eastern District of Missouri, which is the Eighth Circuit. It's unclear, while the plan may be simple, it's unclear how all of those things get unwound. I know, maybe it's an abuse of discretion not to give a stay in these cases where it's clear what's gonna happen. It was clear that the money was gonna go and the Missouri trustee's action's gonna be affected. Well, certainly, I think it was something for Judge Melgren to consider, and we were clear that we were going to distribute money and we were gonna take the steps that were required by the plan. We were directed to by the plan. I would submit, Your Honor, that that's the purpose of having to meet the stay request standards. Well, I'm suggesting maybe it is a reparable harm, assuming if they aren't easily able to get back the funds, they would win an appeal. Isn't that really the functional equivalent of a reparable harm, at least in the bankruptcy context? It potentially could be, Your Honor, but I think that the most important factor here was really just the high on likelihood of success on the merits. And it's important that drive train had to make a showing on, had to establish that all four elements of obtaining a stay were met in order to get one. And the irreparable harm aspect of that is only one piece of it, obviously, but their failure to show a likelihood of success on the merits alone would defeat their stay motion. And I think, actually, this prompts me to make another point that I think makes this particular case unique. There's a statement in these standards about consideration of the public interest, things of that sort, and from my review, at least of the authority, a lot of times that is sort of a throwaway factor, in a way. But here, it's particularly acute because one group of creditors that received distributions under this plan was a group of creditors that was gonna use the money to clean up 60,000 tons of abandoned biomass. What was the biomass? It's abandoned corn stover and wheat stalk. And these things are mountains high and they catch on fire in dry seasons out in western Kansas all the time. And there was substantial discussion in the record, in particular during the stay hearing before Judge Nugent, about how desperate the city of Moscow, Kansas, and Stevens County, Kansas, needed that money to be applied to commence that effort. That brings me to the other part of this case that bothers me, and it is a relatively simple and bankruptcy world liquidation case. I've kind of gotten interested in equitable mootness since we got the briefs in this case. And it seemed like that doctrine was designed for certainly more complex, in their position, reorganization context. And why shouldn't it be limited to rare circumstances, rather than, it looks to me like it's applied in a lot of bankruptcy cases, and the trustee runs to the district court, gets an equitable mootness determination, in all range of cases, and it's effectively over, I suppose. Why should we not allow equitable mootness to overcome the right to appeal? Yeah, and that's a great question, Your Honor. I don't think there's a basis for a categorical exclusion of the doctrine in a Chapter 11 liquidating case. And I'm not aware of any decisions that do that. I would also submit that the Centrix decision from this court, actually, that was a liquidating Chapter 11 case. So, from my perspective, the liquidating posture of the case ought to be something that's taken into account within the context of the test and factors that have been articulated. That was an unpublished case. What's a good circuit case that applies the doctrine in a liquidating context? I think Centrix is the best case, and it's certainly the one we've paid the most attention to. It's an unpublished decision of the Tenth Circuit, but I really think it's about as close to being on all fours with our case as a case could get. I'd like to go back to a couple other things. This notion of there being no innocent creditors. Centrix didn't grapple with the question that troubles Judge Timkovich, which is whether the doctrine applies at all, right? That's correct. This argument, the argument presented by Drivetrain that there should be a categorical exclusion was not presented in the Centrix case. That's correct, Judge. I'd like to go to this notion that there are no innocent creditors in the case, again. And specifically, this idea that equitable mootness should only protect folks that are doing business with a reorganized and operating entity. And some of the examples that were given were folks that are equity sponsors under plans, perhaps folks that provide exit financing to allow the debtor to emerge as an operating concern from a bankruptcy case. And I would submit, Your Honors, that those folks for making those types of investments into a reorganized debtor are gonna pay a lot more attention to the status of any planned confirmation appeal that could potentially affect the reorganized debtor than your average unsecured creditor who's sitting around waiting on the case to conclude so that they can get their money and move on with life. So I'm not sure that I follow the logic of distinguishing between the groups of folks and just this notion of someone has to be doing business with a reorganized debtor. And if there's not, then the doctrine has no application. I don't follow that. Well, who would be the innocent parties that would be heard here if we were to reverse on equitable mootness? I mean, be clear for me, if you would, what would be the discrete categories of people that you think would be harmed here? I think everybody could potentially be harmed. And Drivetrain has conceded in its papers that the likely result of a reversal of the plan confirmation order, if this court were to reverse the mootness determination, would be a conversion to Chapter 7. And that is in their papers. So at that point, a Chapter 7 panel trustee comes in and is appointed. That person's a fiduciary with obligations under the code. Really, I would submit, Your Honors, that all bets are off at that point. I think all the creditors are harmed by that result. It's unclear to me whether that trustee who's not a party to these proceedings or any of these appeals would be bound by settlements and other things that took place in connection with the plan. And it would really create exactly the kind of unmanageable situation that the equitable mootness doctrine is designed to prevent. Thank you, Counsel. Your time has expired. Mr. Dunn, you have some time. Judge Timkovich, I want to come back to your question that we were just discussing about the applicability of equitable mootness. This Court has avoided deciding the Chapter 7 issue in CW Mining and Rich Global. The Fifth Circuit in Superior Offshore has specifically held that the equitable mootness doctrine does not apply to Chapter 11 proceedings  because ways are available to craft the distribution of monies and the dealing with the distribution of monies to avoid equitable mootness. I think one of the critical points here goes to the merits and the substance of the case as my adversary pointed out. And we think on the substance, this is a relatively simple case in the following respect, and that is it is controlled by this Court's decision in Pepsi-Cola. We have here the linchpin of the bankruptcy court's decision was the finding that there was an oral subordination agreement. Pepsi-Cola bottling versus PepsiCo makes it clear that under New York law, that's this Court's decision, under New York law, under the UCC, there can be no such agreement. Any such agreement is ultra-virus. It is not enforceable. And it's clear that the parties here understood that because they entered into what's referred to as the keep order that didn't say, announce we have oral subordination agreement, they said the keep order was conditioned, A, on there being such an order, and B, on such an order being approved by the Missouri Bankruptcy Court because otherwise it would be improper. And I think the clarity of those particular decisions makes it clear that on the substance of the merits, we have a very strong appeal here that's being denied hearing. What was Judge Milgren's resolution at that point? He basically ignored it by looking, he said two things. He said with respect to the Pepsi-Cola decision that the decision to, that the agreement to subordinate claims was not an amendment of the underlying agreement, but rather was a new agreement. Now, I think that really doesn't withstand scrutiny, but with all due respect, it really doesn't matter. And the reason it doesn't matter is because if you read the Pepsi-Cola decision carefully, that same argument was made in Pepsi-Cola. And the court said, this court said, no, no, no, no, no. If you have a comprehensive integrated agreement with a merger clause, which we do here in every one of these instances, then the parties have spoken as to the entirety of their arrangement, and they can't make a new oral agreement. That's prohibited too. So the underlying agreement, assuming that a subordination agreement with a distressed debtor is an amendment to the payment terms, and I think realistically it is, then this court's decision in Pepsi-Cola is directly contrary to what the courts below held. And second, even if you accept the proposition that Judge Melgren advanced, that a subordination agreement is not a modification or amendment of the underlying agreement, but a new agreement, Pepsi-Cola says flat out where you have a merger clause, an integration clause, you can't do that. And therefore, we think the merits here are very, very strong. Thank you, counsel. Your time's expired. I think we understand your arguments. I appreciate the helpful briefing and argument today. Counsel are excused, and the court will be in recess until tomorrow morning at nine.